INDIANA GAS COMPANY, INC., Richmond Gas Corporation d/b/a Indiana Gas Company, Inc. and Terre Haute Gas Corporation d/b/a Indiana Gas Company, Inc., Plaintiffs,

v.

AETNA CASUALTY & SURETY COMPANY, Connie Lee Insurance Company, Continental Casualty Company, Continental Insurance Company, Greenwich Insurance Company, Home Insurance Company, Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies, North River Insurance Company, Ranger Insurance Company, St. Paul Fire & Marine Insurance Company, St. Paul Surplus Lines Insurance Company, and the Travelers Company, Defendants.

No. 1:95–CV–101.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Oct. 2, 1996.

Sherrill W. Colvin, Haller and Colvin, Fort Wayne, IN, Ronald E. Christian, Whitney E. Bakley, Indiana Gas Company, Indianapolis, IN, Edward P. Henneberry, Ezra C. Levine, Peter C. Condron, Howrey and Simon, Washington, DC, Charles H. Samel, Howrey and Simon, Los Angeles, CA, for plaintiffs.

J. Frank Kimbrough, Wilks and Kimbrough, Fort Wayne, IN, Scott H. Sirich, Plunkett and Cooney, Detroit, MI, Charles W. Browning, Kenneth C. Newa, Stephen P. Brown, Richard G. Szymczak, Aetna Casualty and Surety Company, Detroit, MI, for Aetna Casualty & Surety Company.

Roger E. Warin, Evan Anne O'Neill, Harry Lee, John Flyger, James S. Felt, Steptoe and Johnson, Washington, DC, David J. Bloss, Grand Rapids, MI, for Home Insurance Company.

James E. Rocap, Jr., Rocap Witchger and Threlkeld, Indianapolis, IN, Thomas J. Quinn, Stephen Thomas Roberts, Robert J. Keane, Mendes and Mount, New York City, Kandice L. Kilkelly, Rocap Witchger and Threlkeld, Indianapolis, IN, for Certain Underwriters at Lloyd's London.

William L. Sweet, Jr., Beckman Lawson Sandler Snyder and Federoff, Fort Wayne, IN, Kandice L. Kilkelly, Brian S. Fraser, Arthur S. Greenspan, Kenneth Held, Richards Spears Kibbs and Orbe, New York City, for Certain London Market Insurance Companies.

William Anaya, James S. Stickles, Janet A. Kachoyeanos, Johnson and Bell LTD, Chicago, IL, for Ranger Insurance Company.

Mary K. Reeder, Riley Bennett and Egloff, Indianapolis, IN, Kathy P. Waring, Sonia S. Waisman, Luce Forward Hamilton and Scripps, San Diego, CA, for St. Paul Fire & Marine Insurance Company, St. Paul Surplus Lines.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the Court on defendant Ranger Insurance Company's July 10, 1996, "Motion for Partial Summary Judgment Concerning 'Property Damage During the Policy Period,'" a motion in which other defendants have joined. Plaintiffs responded to that motion on July 31, 1996, to which Ranger Insurance replied on August 9, 1996. For the following reasons, the motion for partial summary judgment will be granted.

### Factual Background

Ranger issued Comprehensive General Liability policies to Richmond Gas Corporation for the period from 1975 to 1987 and also issued an Excess Liability policy and Commercial Umbrella Liability for the period 1975–1976. The Ranger policies, and those of the defendants who have joined in the motion, all contained language identical or substantially similar to the effect that the insurers agreed "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies caused by an occurrence." "Occurrence" is then defined as "an accident, including continuous or repeated exposure to conditions, which results in property damage neither expected nor intended from the standpoint of the insured." In turn, "property damage" is defined as "physical injury to or destruction of tangible property which occurs during the policy period."

Indiana Gas has identified three potential sources of contamination associated with the manufactured gas plants (MGP): (1) land disposal of MGP waters; (2) manufactured gas plant operations; and (3) decommissioning activities. There was contamination at each of the sites in question from the time that the contaminants first entered the groundwater and plaintiffs maintain that that contamination continues to the present day.

The specific sources of groundwater contamination at each site have been identified by Indiana Gas's hydrogeology expert, Dr. Thomas Prickett. Dr. Prickett conducted a hyrodgeologic study of groundwater flow and contaminant migration. According to him, the study provided the "most certain indication as to when and how [MGP] chemicals impacted the groundwater and migrated off the MGP sites."[1]

With respect to each of the sites which are at issue in the presently pending motion for partial summary judgment, the following is undisputed:

(1) *The Seymour Site.* An MGP was in operation from 1886 to 1931 and the plant was substantially decommissioned prior to 1945. Dr. Prickett concluded that the groundwater at the site was contaminated by chemicals from the probable site sources by no later than 1954, and that contamination was off-site by no later than 1954.

(2) *The Bedford Site.* The MGP was in operation from 1900 to 1940 and substantially decommissioned prior to 1945. Dr. Prickett concluded that the groundwater at the site was contaminated by chemicals from the probable site by no later than 1954 and that contamination was off-site by no later than 1954.

(3) *The Huntington Site.* The MGP was in operation from 1883 to 1926 and substantially decommissioned by 1945. Dr. Prickett identifies the sole source of groundwater contamination at the site as the "dismantling of [a] holder and filling the base with MGP materials about 1937." Contaminants had entered the groundwater and moved off-site in 1937.

(4) *The Lafayette Site.* An MGP was in operation from 1852 to 1937 and the plant substantially decommissioned by 1945. Releases of hazardous substances at the site resulted in off-site damage to soil and/or groundwater no later than 1952.

(5) *The Shelbyville Site.* An MGP was in operation from 1925 to 1946. Dr. Prickett concluded that the groundwater at the site

1. To do this, Dr. Prickett focused on "the most widespread, fastest moving and reoccurring chemicals at the site."

was contaminated by chemicals from the probable site sources by no later than 1925 and that contaminants had moved off-site by no later than 1940.

(6) *The Richmond Site.* An MGP was in operation from 1855 to 1941. Dr. Prickett concluded that the groundwater at the site was contaminated by chemicals from the probable site sources by no later than 1914, and that contaminants had moved off-site by no later than 1919.

(7) *The Terre Haute Site.* The MGP was in operation from 1886 until the 1930s. Dr. Prickett concluded that the groundwater at the site was contaminated by chemicals from the probable site sources by no later than 1899, and that contaminants had moved off-site by no later than 1924.

Thus with respect to all of the foregoing sites, the groundwater had become contaminated and the contaminants had begun to move off-site by no later than the mid–1950s. There is, however, evidence to suggest that the groundwater from the former MGPs is still running into streams and rivers located near at least six of the sites.

### Application of Law

As indicated at the outset, this matter is presently before the Court on Ranger's motion for partial summary judgment concerning the issue of whether any property damage occurred during the relevant policy periods, a motion in which several of the other defendants have joined. After a review of the summary judgment standards, the parties arguments will be addressed.

### A. *Summary Judgment Standards*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery,

against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *In re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

So that the district court may readily determine whether there are genuine issues of

material fact, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends there is no genuine issue. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record all material facts to which the non-movant contends there are exists a genuine issue necessary to be litigated. *See Waldridge v. American Hoechst Corp. et al.*, 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249–51, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained," and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir.1983).

Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute because the issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

### B. *Property Damage During the Policy Period*

"Under Indiana law, the interpretation of an insurance policy presents a question of law to be decided by the court." *Cincinnati Ins. v. Flanders Elec. Motor Service*, 40 F.3d 146, 151 (7th Cir.1994) (*citing Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind.1992). "The insured has the initial burden of proving coverage under an insurance policy." *Flanders* at 151 (*citing Southbend Escan Corp. v. Federal Ins. Co.*, 647 F.Supp. 962, 966 (N.D.Ind.1986)). Here, there is no dispute that plaintiffs' right to coverage under the insurance contracts is only "triggered" if there was property damage during an insurer's policy period.

"Trigger of coverage" has been defined as follows:

" '[T]rigger of coverage' has been used by insureds and insurer alike to denote the circumstances that activate the insurer's defense and indemnity obligations under the policy. The term 'trigger of coverage' should not be misunderstood as a doctrine to be automatically invoked by the court to conclusively establish coverage in certain categories of cases, or under certain types of policies. The word 'trigger' is not found in the CGL policies themselves.... Instead, 'trigger of coverage' is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the potential of coverage to arise. The issue is largely one of timing—what must take place within the policy's effective dates for the potential of coverage to be 'triggered.' "

*Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 327 n. 2, 913 P.2d 878, 881 n. 2 (1995). Four principal theories regarding trigger of coverage have been recognized:

If coverage is triggered at the time that personal injury or property damage becomes known to the victim or property owner, the approach is identified as the 'manifestation theory.' If coverage is triggered when real personal injury or actual property damage first occurs, the approach is called the injury in fact theory. If coverage is triggered when the first exposure to injury-causing conditions occur then the court is said to have chosen the 'exposure theory.' Finally, if coverage is triggered

in a manner such that insurance policies in effect during different time periods all impose a duty to indemnify, then the approach is labeled a 'continuous' or 'multiple' trigger theory.

*Dow Chemical Co. v. Associated Indemnity Corp.*, 724 F.Supp. 474, 478 (E.D.Mich.1989) (citations omitted).[2]

Given that there are at least four approaches to determine when coverage is "triggered," courts have taken different views as to when coverage attaches in the context of environmental contamination cases. For example, just last year, in *Montrose, supra,* the California Supreme Court determined that the proper approach is the continuous injury trigger theory. *Montrose,* 42 Cal.Rptr.2d at pp. 348–50, 913 P.2d at pp. 902–04; *see also Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co.,* 89 F.3d 976, 994–95 (3rd Cir.1996). Conversely, and also last year, the Minnesota Supreme Court in *SCSC Corp. v. Allied Mutual Insurance Co.,* 536 N.W.2d 305, 318 (Minn.1995), employed the actual injury theory in determining how to allocate damages resulting from a spill which lead to continual leaching. *See also, Armotek Industries v. Employers Ins. of Wausau,* 952 F.2d 756 (3rd Cir.1991).

In the present matter Indiana Gas, not surprisingly, argues that the "multiple trigger" theory should apply here so that it can seek coverage under policies which became effective long after the manufactured gas plants had been decommissioned. In support of that position, Indiana Gas points to *Eli Lilly & Co. v. Home Ins. Co.,* 482 N.E.2d 467 (Ind.1985) as the controlling Indiana law.

In this Court's view, *Eli Lilly,* a case involving DES, is not dispositive in this environmental case. In *Dana Corporation v. Hartford Accident & Indemnity Co. et al.,* No. 49DO1–9301–CP–0026 (Marion Super. Sept. 10, 1996),[3] the Marion Superior Court

cogently indicated why *Eli Lilly* can be limited to its facts:

"[T]he Indiana cases addressing the trigger issue does not require the Court to adopt a continuous trigger in this case. *Eli Lilly & Co. v. Home Ins. Co.,* 482 N.E.2d 467 (Ind.1985), the principal authority relied on by [plaintiff], adopted a continuous trigger in the context of progressive, DES-related diseases. That case is distinguishable, however. The Court in *Eli Lilly* found that the relevant policy language was ambiguous as it relates to DES claims—it was not clear whether the initial *in utero* exposure to DES (which must have caused some injury, since the exposure was not repeated, and allegedly caused numerous diseases 20 years later) was the relevant injury for coverage purposes, or whether the subsequent manifestation of disease was the relevant injury. In the environmental property damage context, however, there is no such ambiguity—it is not a question of *which* injury counts, but of *when* injury results. The Court in *Eli Lilly* did not suggest that coverage was first triggered when a doctor prescribed DES, or when a mother purchased the drug. Instead, the trigger period began at the date of the earliest actual injury."

*Id.* at pp. 351–52, 913 P.2d at pp. 905–06 (italics in original); *see also Armotek supra* at 763 (discussing the "unique character" of the problem created by policy language in the context of diseases with long latency periods as opposed to chemical contamination cases). This Court agrees with the foregoing language in *Dana.*

Further support for this Court's conclusion that *Eli Lilly* is not dispositive in this action can be found in the Indiana Court of Appeals post-*Eli Lilly* decision of *Great Lakes Chemical Corp. v. International Surplus Lines Ins. Co.,* 638 N.E.2d 847 (Ind.App.1994).

---

**2.** The "continuous" or "multiple" trigger theory has also been referred to as the "triple trigger theory" because it expresses the notion that the injury occurs during each of three phases of environmental contamination—exposure, exposure in residence and manifestation.

**3.** The decision in *Dana* was brought to this Court's attention as an attachment to a letter for counsel from London Market Insurers dated September 16, 1996. Indiana Gas, in a letter to this Court dated September 19, 1996, addressed the issues raised in the *Dana* decision. Both letters have been made a part of the record in this cause.

There, the court addressed the trigger issue in the context of a case involving the pesticide EDB. The court in *Great Lakes* indicated that it agreed with the "general rule" that "the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged." *Id.* at 854. Thus, on the facts before it, the court wrote that "the general rule simply holds that the time when the EDB pesticides were manufactured is not the time of the occurrence which triggers coverage, but the trigger for coverage is the time when the complaining party was damaged. Here, the City was damaged when the EDB pesticides were applied to the soil and contaminated the groundwater." *Id.*

Likewise here, the damage occurred when the property was contaminated, an event which occurred long before any of the relevant policies were issued. Indiana Gas's own expert, Dr. Prickett, admitted that the groundwater underlying each of the seven sites was contaminated and had contaminated third party property before the inception of the policies. No pollutants which could have caused third party property damage were ever discharged at the sites during any policy period because there were no MGP operations during those periods (the plants had been decommissioned) and Dr. Prickett has indicated that the sources of contamination were in existence and had already contaminated the groundwater and third party property before any policy period. Thus, under *Great Lakes,* present defendants' policies can not be triggered because the third party damage occurred before any policy period.

In reaching the foregoing conclusion that there was no property damage which occurred during the policy period as required by the policies, this Court is not unmindful of Indiana Gas's argument to the effect that there is evidence to suggest that groundwater from the former manufactured gas plants is running into bodies of water which surround the sites. This, however, does not salvage their claim.

In *Inland Waters Pollution Control, Inc. v. National Union Fire Insurance Co.,* 997 F.2d 172 (6th Cir.1991),[4] the United States Court of Appeals for the Sixth Circuit was presented with, and rejected, a similar argument. There, drums containing liquid wastes were crushed during the first two months of 1981 allowing the wastes to leak into the soil. An examination six years later by the state department of natural resources revealed significant contamination. The policyholder sued its insurer under a policy which became effective some six months after the leak had occurred arguing that "the definition of 'occurrence' in the policies [was] broad enough to cover the damage to [the] property which was continually occurring during the policy periods as contaminants migrated through the soil and groundwater." *Id.* p. 182. The policy at issue (similar to that here) provided that coverage is triggered by property damage which occurred during the policy period. With respect to the allegation of continual leakage into the groundwater, the Sixth Circuit wrote:

> Concerning damage to the groundwater, we hold that the district court erred by granting summary judgment because there is a genuine issue of material fact regarding when the groundwater first became contaminated. Although Inland Waters allowed liquid waste to escape into the soil in January or February 1981, it cannot be determined from the present record the length of time required for the contaminants to filter through the soil and reach the groundwater. If evidence establishes that the groundwater was first contaminated after August 1981, there could be coverage under the occurrence policy, and National Union could be liable for breach of the duty to defend. *On the other hand, if evidence established that the groundwater first became contaminated before August 1981, there would be no coverage, and, hence, no duty to defend.* Accordingly, we reverse and remand the case to the district court for resolution of the question of fact

4. This decision was originally unpublished but was subsequently published as an appendix to

*Inland Waters Pollution Control Inc. v. National Union Fire Ins. Co.,* 997 F.2d 172 (6th Cir.1993).

as to when the groundwater first became contaminated.

*Id.* at p. 187 (italics added).[5]

Here, there is no dispute that at all of the sites in question, the contamination occurred and the groundwater was affected prior to the policies at issue. While there still may be some continuing effect on the groundwater, there is no evidence that any new pollutants that could have damaged third party property were ever added to the environment during any of the policies at issue. *Cf. Armotek supra* 952 F.2d at 763 (regarding failure "to prove that separable injury to property occurred after 1979 as the chromic acid migrated underground").

### Conclusion

In light of the foregoing, defendant Ranger Insurance Company's July 10, 1996, "Motion for Partial Summary Judgment Concerning 'Property Damage During the Policy Period'" is GRANTED. Summary Judgment is also entered on this issue in favor of all defendants who have joined in that motion.

---

5. A similar result was reached in *SCSC Corp. supra.* There, the actual injury to third party property occurred as a result of a 1977 spill. Despite the "continual leaching of chemicals from the soil into the groundwater," the Minnesota Supreme Court reversed the trial court's application of a "multi-year vertical trigger" which would have triggered all policies on the risk during the leaching and found that only the policies in effect in 1977 were liable. 536 N.W.2d at 318.